# In the United States Court of Federal Claims

No. 19-520C
(Filed Under Seal: August 25, 2022)
(Reissued: September 30, 2022)*
**FOR PUBLICATION**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| KATHY AITKEN, *et al.*, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Molly A. Elkin*, McGillivary Steele Elkin LLP, Washington, D.C., for Plaintiffs. With her on briefs were *T. Reid Coploff* and *Sarah M. Block*, McGillivary Steele Elkin LLP, Washington, D.C.

*Bret R. Vallacher*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant, United States. With him on briefs were *Brian M. Boynton*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Martin F. Hockey, Jr.*, Acting Director, *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., as well *Nathan M. Atkinson*, Assistant General Counsel, Employment Law Branch, Federal Bureau of Prisons, United States Department of Justice, Kansas City, KS.

## OPINION AND ORDER

Plaintiffs — current and former Federal Bureau of Prisons employees at Federal Correctional Institution Otisville ("FCI Otisville" or "the Prison") — seek overtime pay under the Fair Labor Standards Act ("FLSA") and other forms of relief

---

* Pursuant to the protective order in this case, the Court initially filed this opinion under seal on August 25, 2022, for the parties to propose redactions of confidential or proprietary information. The parties were directed to propose redactions by September 8, 2022. Per the Court's order of August 31, 2022, (ECF 53), the parties were granted an extension to September 22, 2022 to propose redactions. Proposed redactions were received from the Defendant and no redactions were received from the Plaintiff. The Court has incorporated Defendant's proposed redactions and makes them with bracketed ellipses ("[. . .]" below.

related to uncompensated pre- and post-shift work. The parties' cross-motions for summary judgment are ripe for disposition.[1]

Although there are some issues where there is no genuine dispute of material fact and judgment as a matter of law is possible, there are also several factual disputes that prevent granting either motion in full. *See* RCFC 56. Accordingly, Plaintiffs' motion is **DENIED**, and Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

FCI Otisville includes a medium-security facility that houses approximately 800 inmates convicted of federal crimes. Pls.' Mem. App. A at 66–68 (ECF 28-1) (Whinnery Dep.); Def.'s App. at 656 (ECF 31-2) (O'Kane Decl. ¶ 5).[2] Plaintiffs' "primary job duty" there is to maintain the safety and security of the inmates, staff, and Prison. Pls.' Mem. App. A at 73, 79, 88, 150 (Whinnery Dep.). One of their responsibilities is to inspect for contraband, confiscate contraband, and prevent contraband from entering FCI Otisville. *Id.* at 96, 105–06. Another is to correct inmate violations of Prison rules. *Id.* at 89–91.

As relevant to this case, Plaintiffs' workdays are organized by 8-hour assigned shifts at certain posts that are staffed for 16 or 24 hours per day. *E.g.*, Pls.' App. B at 3–4 (ECF 28-2) (Buckingham Decl. ¶¶ 4–5).[3] Different posts entail different specific activities and responsibilities. In general, Plaintiffs must be at their posts by the beginning of the shift, *e.g., id.* at 7 (Buckingham Decl. ¶ 17), and remain at their posts until relieved by an incoming officer, Pls.' Mem. App. A at 122 (Whinnery Dep.). The shifts do not overlap. *E.g.*, Pls.' App. B at 4 (Buckingham Decl. ¶¶ 6–7).

For each shift there is a certain amount of pre- and post-shift activity that is not compensated, but which Plaintiffs contend should be treated as work. The pre- and post-shift activities at issue include (1) pre-shift security screening, (2) donning a duty belt with various attached items, (3) clearing the "sally port" and picking up equipment, (4) walking to the employee's assigned post, (5) completing equipment and information exchanges, and (6) leaving the post at the end of the day. Except for

---

[1] Pls.' Mot. for Part. Summ. J. (ECF 27) ("Pls.' Mot.") and Pls.' Mem. ISO Mot. for Part. Summ. J. (ECF 28) ("Pls.' Mem."); Def.'s Cross-Mot. for Part. Summ. J. & Resp. to Pls.' Part. Mot. for Summ. J. (ECF 31) ("Def.'s Cross-Mot."); Pls.' Reply & Opp. to Def.'s Cross-Mot. for Part. Summ. J. (ECF 35) ("Pls.' Reply"); Def.'s Reply ISO Cross-Mot. for Part. Summ. J. (ECF 38) ("Def.'s Reply"). I heard oral argument on March 31, 2022. Tr. of Oral Arg. (ECF 50) ("Tr.").
[2] All citations to the Plaintiffs' Appendices are to the ECF-stamped page numbers with the particular deposition or declaration noted in parentheses. Citations to Defendant's Appendix are to the page numbers at the bottom of the Appendix's pages (which, in the Appendix, are designated as "A__").
[3] Not all posts in the Prison are covered by Plaintiffs' claims.

one issue described below, the parties agree that Plaintiffs are not compensated for their time in those activities.

The parties disagree on how much time those activities require. Plaintiffs' declarants claim that the uncompensated activities take approximately 30 minutes per day. Pls.' App. B at 14–15 (Buckingham Decl. ¶ 40) (35 minutes); *id.* at 29 (Conklin Decl. ¶ 38) (35 minutes); *id.* at 43–44 (Hackett Decl. ¶ 40) (25 minutes); *id.* at 54–55 (Hagenburg Decl. ¶ 31) (30 minutes); *id.* at 67 (McPhillips Decl. ¶ 37) (20 minutes); *id.* at 78–79 (Skelly Decl. ¶ 33) (25 minutes); *id.* at 94–95 (Smith Decl. ¶ 42) (30 minutes); *id.* at 106–07 (Tufano Decl. ¶ 33) (25 minutes). Defendant cites video analyses purporting to show that Plaintiffs' pre- and post-shift time in the Prison is in fact much shorter, Def.'s App. at 620–53 (Susney Decl.), though Plaintiffs dispute whether the analyses used reliable methods. Pls.' Reply at 33–37.

The relevant facts describing each pre- and post-shift activity are as follows.

### 1. Security Screening

On arrival at the Prison, Plaintiffs must pass through a screening site. Pls.' Mem. App. A at 105, 142–43 (Whinnery Dep.). Screening involves walking through a metal detector and passing other items on a conveyor belt through an x-ray machine. *E.g.*, Pls.' App. B at 7–8 (Buckingham Decl. ¶ 20); Pls.' Mem. App. A at 142–43 (Whinnery Dep.). The purpose of the security screening is to prevent contraband from entering the Prison. Pls.' Mem. App. A at 105–06 (Whinnery Dep.); *see also*, *e.g.*, Pls.' App. B at 8 (Buckingham Decl. ¶ 21).

### 2. Donning the Duty Belt

Before beginning work, Plaintiffs must be able to attach their equipment to their persons. The parties seem to agree — and the record bears out — that an officer must eventually have a belt on, and that the metal chits Plaintiffs use to check out equipment cannot be worn through the metal detector at the security screening. Pls.' Mem. App. A at 99–100, 104 (Whinnery Dep.); *see also*, *e.g.*, Pls.' App. B at 8–9 (Buckingham Decl. ¶¶ 23–24). But the record is ambiguous as to many other details.

The parties disagree, among other things, about exactly where donning takes place. Plaintiffs point to evidence that the duty belt is passed through the security x-ray, Pls.' Mem. App. A at 99–100 (Whinnery Dep.), and that they must don their duty belts before entering the secure confines of the Prison because it is unsafe to carry the duty belt without securing it, *e.g.*, Pls.' App. B at 9 (Buckingham Decl. ¶ 24). Defendant responds that Plaintiffs sometimes carry their duty belts after passing through security on their way to their duty posts, Def.'s App. at 98 (Whinnery Dep.), or could — at least in theory — wear the belts through security, *id.* at 658 (O'Kane

Decl. ¶ 16). The parties also disagree about whether the belt itself and the attached clips and chits constitute a piece of specialized equipment. *Id.* at 97–98 (Whinnery Dep.); *id.* at 658 (O'Kane Decl. ¶ 14); Pls.' Reply App. A at 21–22, 38; Pls.' Mem. App. A at 155–56 (Whinnery Dep.).

### *3. Clearing the Sally Port*

After clearing the screening site, Plaintiffs proceed to the "A-1 sally port" which "is the primary entry and exit point at the secured perimeter" of the Prison. Pls.' Mem. App. A at 133 (Whinnery Dep.); *e.g.*, Pls.' App. B at 9 (Buckingham Decl. ¶ 24). Once there, Plaintiffs are identified by other officers in the Control Center and flip their accountability chits, which signal that a given officer has entered the Prison. Pls.' Mem. App. A at 109–11 (Whinnery Dep.); *id.* at 5 (Dumont Dep.). After clearing the sally port, Plaintiffs walk to the Administration Building. Pls.' Mem. App. A at 110–11 (Whinnery Dep.).

### *4. Proceeding to the Duty Post*

When assigned to shifts at the Control Center, Plaintiffs enter the Administration Building through another sally port. *E.g.*, Pls.' App. B at 10 (Buckingham Decl. ¶ 27).[4] When assigned to other duty posts, however, Plaintiffs pass through a different sally port to the Prison's secure compound. Pls.' Mem. App. A at 10–12 (Dumont Dep.); *e.g.*, Pls.' App. B at 11 (Buckingham Decl. ¶ 30). Once on the compound, Plaintiffs are locked inside the Prison with the inmates. *E.g.*, *id.* Plaintiffs must maintain "constant vigilance" while proceeding to their duty posts. Pls.' Mem. App. A at 113–14 (Whinnery Dep.). For some duty posts, Plaintiffs must go through an additional sally port or secure door when they arrive. Pls.' Mem. App. A at 15, 21 (Dumont Dep.); *id.* at 108 (Whinnery Dep.).

The parties disagree about what the walk involves and how much Plaintiffs interact with inmates on the way. Plaintiffs point to evidence that they have "frequent direct contact with" inmates during the walk, *see* Pls.' Mem. App. A at 126 (Whinnery Dep.), including correcting inmate behavior, *id.* at 92–96; *e.g.*, Pls.' App. B at 12–13 (Buckingham Decl. ¶¶ 32, 37). But other evidence could show that because of the schedules for inmate movement and shift transitions, Plaintiffs generally would not be on the compound at the same time as inmates, Def.'s App. at 508–14, 541, 575, 584 (post orders); Pls.' Mem. App. A at 72–73, 76–77 (Whinnery Dep.), and that in any event correcting inmate behavior does not take any extra time, Def.'s App. at 107–08 (Whinnery Dep.). It may also be that at certain times, Plaintiffs can avoid interacting with inmates entirely by taking certain routes through the Prison. *Id.* at

---

[4] When assigned to the "J Unit" Control post, Plaintiffs go through a different sally port. Pls.' App. B at 14 (Buckingham Decl. ¶ 39); Pls.' Mem. App. A at 143–44 (Whinnery Dep.); Tr. at 13.

69, 102–03. While Plaintiffs claim that they are required to respond to body alarms that sound if there is an emergency, Pls.' Mem. App. A at 115, 147–48 (Whinnery Dep.); *see, e.g.*, Pls.' App. B at 12 (Buckingham Decl. ¶¶ 33), other evidence suggests that if Plaintiffs did respond to such alarms outside their scheduled shifts, they would be compensated for their time. Def.'s App. at 101 (Whinnery Dep.).

Plaintiffs claim that they stop at the Lieutenant's office, where they receive "a briefing from [their] supervisor and check in regarding the previous shift." *E.g.*, Pls.' App. B at 11 (Buckingham Decl. ¶ 31). The Lieutenant's office is also where Plaintiffs perform certain administrative functions, such as checking their work mailboxes and completing overtime slips. *Id.*; Pls.' Mem. App. A at 9–10 (Dumont Dep.). Defendant responds that stopping in the Lieutenant's office is not required, Def.'s App. at 7–9 (Dumont Dep.), and unnecessary because there are other ways to obtain the information, such as by reviewing an electronic logbook called [. . .] that contains briefings from the Lieutenant(s) and information about incidents that occurred on posts. *Id.* at 80–81 (Whinnery Dep.); *id.* at 12–13 (Dumont Dep.). Defendant also cites evidence that Plaintiffs are not required to check their mailboxes, Def.'s App. at 9 (Dumont Dep.); *id.* at 575 (post order), that they will receive overtime pay whether or not they complete the slips, *id.* at 34 (Meyers Dep.), and that they need not return the slips in-person to the Lieutenant's office, *id.* at 89 (Whinnery Dep.).

### 5. *Equipment and Information Exchange*

At most posts, shift transitions involve an exchange of equipment including [. . .] with the outgoing officer. Pls.' Mem. App. A at 119–20 (Whinnery Dep.); Pls.' App. B at 12–13 (Buckingham Decl. ¶ 35).[5] Only one officer is paid during the exchange. Pls.' Mem. at 16; Def.'s Cross-Mot. at 10.

[. . .]. *See* Def.'s App. at 67, 88 (Whinnery Dep.); Pls.' Mem. App. A at 102 (Whinnery Dep.). [. . .]. *E.g.*, Pls.' App. B at 9–12 (Buckingham Decl. ¶¶ 26, 30, 35).

The parties disagree about whether the equipment exchange for 16-hour posts is compensated. Defendant points to the Prison's post orders as evidence that Plaintiffs are allowed compensated time during their shifts for exchanges when assigned to 16-hour posts. Def.'s App. at 508, 573, 575, 584, 597; Tr. at 105–07. Plaintiffs' declarations assert that the post orders have not been applied according to their terms. Pls.' App. B at 14–15 (Buckingham Decl. ¶ 40); *id.* at 29 (Conklin Decl. ¶ 38); *see* Tr. at 63–65, 131–32.

---

[5] The exchanges for officers assigned to the Control Center and the J Unit Control post appear to involve an inventory of equipment maintained at the post. *E.g.*, Pls.' App. B at 10, 14 (Buckingham Decl. ¶¶ 27, 39); *id.* at 43 (Hackett Decl. ¶ 38).

During the equipment exchange, the outgoing officer tells the incoming officer about any safety and security issues. *E.g.*, Pls.' App. B at 13 (Buckingham Decl. ¶ 36). Defendant does not dispute that some kind of exchange occurs, Def.'s Cross-Mot. at 9, but contends that it is unnecessary because the information can be obtained through [. . .], Def.'s App. at 80–81 (Whinnery Dep.); *id.* at 12–13 (Dumont Dep.), and because it is unproductive, *id.* at 70 (Whinnery Dep.) (describing the information exchange as a "BS session").

### *6. Post-Shift Activities*

When the shift is over and a new officer arrives, Plaintiffs exchange equipment with the incoming officer, proceed through the A-1 sally port, and exit the Prison. Pls.' Mem. App. A at 56–57 (Juenger Dep.). They do not pass through a security screening on the way out. *Id.* at 57. Exiting the Prison involves activities similar to Plaintiffs' walks to their duty posts at the start of their shifts, *e.g.*, Pls.' App. B at 13–14 (Buckingham Decl. ¶¶ 37–38), and the parties dispute the details of the walk in similar terms. Pls.' Mem. App. A at 72–73, 92–96, 126 (Whinnery Dep.); *e.g.*, Pls.' App. B at 12–13 (Buckingham Decl. ¶¶ 32, 37); Def.'s App. at 508–14, 541, 575, 584 (post orders); *id.* at 107–08 (Whinnery Dep.).

## **DISCUSSION**

### I. **Jurisdiction**

The United States Court of Federal Claims has jurisdiction under the Tucker Act to adjudicate "any claim against the United States founded … upon … any Act of Congress or any regulation of an executive department … in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Because the Tucker Act is "a jurisdictional statute [that] does not create any substantive right enforceable against the United States for money damages," *United States v. Testan*, 424 U.S. 392, 398 (1976) (citing *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 605–07 (1967)), parties asserting Tucker Act jurisdiction must "identify a substantive right for money damages against the United States separate from the Tucker Act itself." *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004). That requires a "money-mandating" source of law, *i.e.*, a statute or regulation that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained and is reasonably amenable to the reading that it mandates a right of recovery in damages." *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1307 (Fed. Cir. 2008) (quotes and citations omitted) (quoting *United States v. Mitchell*, 463 U.S. 206, 217 (1983), and *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003)).

Plaintiffs' claims for unpaid overtime and liquidated damages arise under FLSA, which is a money-mandating source of law. *See Abbey v. United States*, 745

F.3d 1363, 1369 (Fed. Cir. 2014). Because Plaintiffs are government employees seeking backpay and related relief, *see* Pls.' App. B at 3 (Buckingham Decl. ¶ 1); *id.* at 18 (Conklin Decl. ¶ 1); *id.* at 33 (Hackett Decl. ¶ 1); *id.* at 47 (Hagenburg Decl. ¶ 1); *id.* at 57 (McPhillips Decl. ¶ 1); *id.* at 70 (Skelly Decl. ¶ 1); *id.* at 82 (Smith Decl. ¶ 1), they have standing to raise those claims.

Defendant has not objected to any Plaintiff's claims on statute of limitations grounds. But "the special statute of limitations governing the Court of Federal Claims requires" that timeliness be considered a jurisdictional question, calling for "*sua sponte* consideration." *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 132 (2008). FLSA claims must be brought within two years of alleged violations, or within three years if the violations were willful. 29 U.S.C. § 255(a). Plaintiffs claim that the alleged violations were willful, and at least some Plaintiffs declare that they have worked at the Prison since April 9, 2016, three years before the Complaint was filed. *See* Pls.' App. B at 3 (Buckingham Decl. ¶ 2); *id.* at 18 (Conklin Decl. ¶ 2); *id.* at 47 (Hagenburg Decl. ¶ 2); *id.* at 57 (McPhillips Decl. ¶ 2); *id.* at 70 (Skelly Decl. ¶ 2); *id.* at 82 (Smith Decl. ¶ 2). Plaintiffs have therefore established claims within the statute of limitations for purposes of the present motions.[6]

## II. Merits

### A. Legal Standards

#### 1. Summary Judgment

Plaintiffs seek summary judgment as to liability, and Defendant seeks summary judgment and dismissal of the case. I consider the motions under RCFC 56, which is modeled on the analogous federal rule.[7] A party seeking summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[6] Each Plaintiff will need to establish his exact dates of employment in order to recover at trial.
[7] *Kraft, Inc. v. United States*, 85 F.3d 602, 605 n.6 (Fed. Cir.) ("The precedent interpreting the Federal Rules of Civil Procedure applies with equal force to the comparable Rules of the Court of Federal Claims."), *modified on denial of reh'g*, 96 F.3d 1428 (Fed. Cir. 1996).

Cross-motions for summary judgment should be evaluated as independent motions. "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 313–14 (2d Cir. 1981)). "[T]he court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case" even if the parties agree that no material facts are disputed and summary disposition is appropriate. *Williams v. United States*, 144 Fed. Cl. 218, 230 (2019) (citing *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir. 1988)).

### 2. *FLSA and Compensable Work*

Under FLSA, employees are entitled to compensation for hours worked, including work "suffer[ed] or permit[ted]" by their employer. *See* 29 U.S.C. §§ 203(g), 207(a)(1); *see also* 5 C.F.R. § 551.401(a). The Portal-to-Portal Act clarifies that compensable hours do not include travel and other "activities which are preliminary to or postliminary to [the employee's] principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a). But if an employee performs his principal activities, including tasks integral and indispensable to his work, before or after his shift — and if the time he spends is more than *de minimis* — compensation is generally required.[8]

Only time that federal employees spend on their principal activities is compensable. Office of Personnel Management ("OPM") regulations preclude compensation for "[t]ime spent in preliminary or postliminary activities … even if it occurs between periods of activity that are compensable as hours of work." 5 C.F.R.

---

[8] *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014) (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29–30 (2005) (itself quoting *Steiner v. Mitchell*, 350 U.S. 247, 252–53 (1956))); *Bobo v. United States*, 136 F.3d 1465, 1468 (Fed. Cir. 1998); 5 C.F.R. § 551.412(a)(1) (requiring compensation for activities taking more than ten minutes per workday that are "closely related to an employee's principal activities, and … indispensable to the performance of the principal activities"). The governing regulation, promulgated by the Office of Personnel Management, diverges slightly from the Supreme Court's formulation by substituting the phrase "closely related" for "integral." *Compare* 5 C.F.R. § 551.412(a)(1), *with Integrity Staffing*, 574 U.S. at 33. *Integrity Staffing* appears to address the relationship between "closely related" and "integral" by quoting a Department of Labor interpretation of the Portal-to-Portal Act: "Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance." 574 U.S. at 35 (quoting 29 C.F.R. §790.8(c)). Because the "integral and indispensable" test is the Supreme Court's gloss on the Portal-to-Portal Act, the regulation might be in conflict with the statute if it means something different. I will therefore assume that the regulation's standard is identical to what the Supreme Court has derived from the Portal-to-Portal Act.

§ 551.412(b). That distinguishes the law applicable in this case from private sector employment disputes governed by the "continuous workday rule," under which all time between the first and last principal activity of the day must generally be compensated. *See Bridges v. United States*, 156 Fed. Cl. 129, 134 (2021), *appeal filed*, No. 22-1140 (Fed. Cir. Nov. 10, 2021).

"Principal activities" include the work an employee is "employed to perform," 29 U.S.C. § 254(a)(1), plus "all activities which are an 'integral and indispensable part of the principal activities.'" *Integrity Staffing*, 574 U.S. at 33 (quoting *IBP*, 546 U.S. at 29–30). An activity is integral and indispensable to the employee's principal activities — and thus *part* of the principal activities, *see IBP,* 546 U.S. at 33 — "if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing*, 574 U.S. at 33. To meet that test, it is not enough that a given activity is required by the employer or done for the employer's benefit. *Id.* at 36. Rather, the question is whether the activities are "tied to" — that is, integral and indispensable to — "the productive work that the employee is *employed to perform*." *Id.*

A few examples illustrate the "integral and indispensable" test. On the one hand, time meatpackers spend on knife-sharpening is integral and indispensable to their work, because without it they could not cut meat safely and efficiently. *Id.* at 34 (citing *Mitchell v. King Packing Co.*, 350 U.S. 260, 262 (1956)). Time battery plant employees spend "showering and changing clothes" to protect themselves against chemicals that are "toxic to human beings" is integral and indispensable to their work as well: Poisoned employees cannot do their jobs. *Id.* (quoting *Steiner*, 350 U.S. at 249). On the other hand, time spent *waiting* to don protective gear is "two steps removed from the productive activity," and therefore not integral and indispensable. *IBP*, 546 U.S. at 42. Most relevant to this case, the Supreme Court has also excluded time warehouse employees spend being screened for theft after their shifts: The employees' principal activity was not "to undergo security screenings, but to retrieve products from warehouse shelves and package those products for shipment," so "[t]he security screenings … were not 'integral and indispensable' to the employees' duties[.]" *Integrity Staffing*, 574 U.S. at 35.

In addition, as mentioned, even pre- and post-shift time spent on "integral and indispensable" activities must be more than *de minimis* to be compensable. Periods of time adding up to less than 10 minutes per workday are *de minimis*, and therefore noncompensable. 5 C.F.R. § 551.412(a)(1); *see Bull v. United States*, 68 Fed. Cl. 212, 244 n.25, *decision clarified*, 68 Fed. Cl. 276 (2005), *aff'd*, 479 F.3d 1365 (Fed. Cir.

2007); *Riggs v. United States*, 21 Cl. Ct. 664, 682 (1990).[9] The Federal Circuit has also indicated that in some circumstances, periods of time *longer* than 10 minutes can be *de minimis* too. *See Carlsen v. United States*, 521 F.3d 1371, 1380 (Fed. Cir. 2008), *as corrected on reh'g* (Apr. 29, 2008) ("While it is true that the period that is normally regarded as the cut-off for *de minimis* overtime is 10 minutes, that number has not been treated as a rigid maximum.") (citation omitted).

### B. Plaintiffs' Pre- and Post-Shift Time

To decide whether Defendant violated FLSA by failing to pay Plaintiffs' overtime, I must determine whether the activities Plaintiffs completed were (1) integral and indispensable to their principal activities and (2) more than *de minimis*. I discuss Plaintiffs' various activities to ascertain whether there are any disputed questions of material fact regarding their compensability under FLSA.

*1. Security Screening*

The first activity at issue is the security screening Plaintiffs undergo when they arrive at work. Pls.' Mem. App. A at 97 (Whinnery Dep.). The purpose of the security screening is to prevent contraband from entering the Prison. *Id.* I have twice granted motions to dismiss FLSA claims by prison employees for time spent in security screenings because the time was not "integral and indispensable" to their principal activities. *Alkire v. United States*, 158 Fed. Cl. 380, 391 (2022); *Medrano v. United States*, 159 Fed. Cl. 537, 545 (2022). The same result is required at summary judgment on the facts presented here.

The security screenings are not the "principal activity or activities which [Plaintiffs are] employed to perform." 29 U.S.C. § 254(a)(1). Plaintiffs' "primary job duty," rather, is to maintain the safety and security of the inmates, staff, and Prison. Pls.' Mem. App. A at 73, 79, 88, 150 (Whinnery Dep.). An aspect of ensuring safety and security is that Plaintiffs inspect for contraband, confiscate contraband, and prevent contraband from entering FCI Otisville, *id.* at 96, 105–06, but like the employees in *Integrity Staffing*, Plaintiffs have no evidence that they are "employ[ed] … to undergo security screenings," 574 U.S. at 35, or that there is anything "productive" about the security screenings. *Id.* at 36.

Nor is there evidence that security screenings are integral or indispensable to Plaintiffs' work, as the Supreme Court has defined the Portal-to-Portal Act

---

[9] Plaintiffs belatedly claim that 5 C.F.R. § 551.412(a)(1) and 5 C.F.R. § 551.412(b) are inconsistent with DOL regulations to the disadvantage of covered federal employees, Tr. at 33–38; Pls.' Reply at 29–30, but have not yet adequately presented the argument that either provision is invalid. *See, e.g.*, *Bridges*, 156 Fed. Cl. at 134 n.4.

standard.[10] One consequence of the Portal-to-Portal Act is to separate "activities that are essentially part of the ingress and egress process" from "activities that constitute the actual 'work of consequence performed for an employer[.]'" *Integrity Staffing*, 574 U.S. at 38 (Sotomayor, J., concurring) (quoting 29 C.F.R. § 790.8(a)). Pre-shift security screenings, like post-shift screenings for employee theft and other arrival and departure processes, "fall on the 'preliminary or postliminary' side of this line." *Id.* at 38–39 (alteration omitted).

The facts give no basis for finding that undergoing a security screening is an "intrinsic element" of maintaining safety inside the Prison any more than the screening in *Integrity Staffing* was an intrinsic element of handling products inside a warehouse. There is no dispute that excluding contraband from the Prison and confiscating it when found is an "important aspect of Plaintiffs' primary job duty to ensure safety and security." Pls.' Mem. at 5 (citing Pls.' Mem. App. A at 96, 105–06 (Whinnery Dep.)). I understand that to mean employees are personally responsible for not bringing contraband into the Prison, and that Prison guards screen visitors, employees, and inmates for contraband. But it does not follow that *being screened* to ensure compliance with contraband rules is an intrinsic part of Plaintiffs' job.

On the contrary: Just as a theft screening is "not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment," *Integrity Staffing*, 574 U.S. at 35, Plaintiffs point to nothing in the record suggesting that they must spend time in screening in order to remove contraband from the Prison, screen others for contraband, and refrain from bringing contraband in. The screening and the job functions are distinct in every way. They are certainly not related in the way that sharpening a knife is connected with cutting meat, or that wearing protective gear is connected with handling dangerous chemicals. *Steiner*, 350 U.S. at 249–50; *King Packing*, 350 U.S. at 262. The screening — like other kinds of waiting time before or after shifts — is therefore "two steps removed" from the activities the employees are employed to perform. *IBP*, 546 U.S. at 42. That means the work and the screening are not "intrinsic" to each other. *See Integrity Staffing*, 574 U.S. at 38 (Sotomayor, J., concurring) (observing that screenings were not principal activities even though they "in some way related to the work that the employees performed").

For similar reasons, Plaintiffs' screenings are not "indispensable" to their work because they are not activities "with which the employee cannot dispense if he is to

---

[10] "As explained above, an activity is not integral and indispensable to an employee's principal activities unless it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities." *Integrity Staffing*, 574 U.S. at 35.

perform those activities." *Id.* at 35 (majority opinion). Plaintiffs emphasize the importance of preventing contraband from entering the Prison and argue on that basis that contraband screenings are part of their principal activities. Pls.' Mem. at 25–26. But it is not the *screening* that makes it possible for Plaintiffs to do their jobs; rather, it is following Prison rules that forbid contraband.

Suppose two Prison employees came to work at the same duty post on the same day, neither one carrying contraband. Even if one was screened and the other was not, nothing in the record suggests they could not perform their own duties equally well. Or suppose there are two hypothetical prisons, one of which screened all its employees and one of which did not. There is no dispute that the safety and effectiveness of the employees inside each prison would depend on whether they introduced contraband, rather than on whether they were screened. Precisely the same was true in *Integrity Staffing*: Assuming warehouse employees refrained from stealing, whether they were screened or not at the end of their shifts makes no difference in whether they could do their jobs. The only inference from the facts is that like in *Integrity Staffing*, the Prison "could have eliminated the screenings altogether without impairing the employees' ability to complete their work." 574 U.S. at 35.[11]

There is no interpretation of the record that avoids *Integrity Staffing*. One way to construe Plaintiffs' argument is that a Prison employee *who introduces contraband into the Prison* cannot safely do his job. Or perhaps Plaintiffs mean that an employee cannot do his job if *other* employees have introduced contraband. But it is equally obvious that the employees in *Integrity Staffing* could not have done their work of "retrieving products from warehouse shelves or packaging them for shipment" if they (or their colleagues) were stealing the products instead. *Id.* at 35. If that were enough to render a screening indispensable, *Integrity Staffing* would have allowed the employees' claims to proceed.

Yet another construction of Plaintiffs' argument is that excluding contraband is essential to Prison management, such that managing the Prison is impossible unless Plaintiffs are not only prohibited from bringing contraband but screened at entry. But even that is irrelevant to the *Integrity Staffing* test, which focuses solely on indispensability to "*the employee.*" 574 U.S. at 35 (emphasis added). A warehouse,

---

[11] That also distinguishes this case from *King Packing* and *Steiner*. A meatpacker can cut meat if he sharpens his knives, but not if he fails to do so. *King Packing*, 350 U.S. at 262 ("[A] knife to be of any practical value in a knife job has to be sharp.") (quotes and alteration omitted). A battery plant employee can work if he wears protective clothing, but not if he is poisoned by lead and burned by sulphuric acid. *Steiner*, 350 U.S. at 249–50. In both cases, the specific use of time at issue was what made the work possible.

after all, could not function if its employees walked off with the merchandise. That is presumably why the employer in *Integrity Staffing* required post-shift screening. Just so here: The *Prison* may not be able to dispense with screenings — as opposed to only a written policy on contraband — but nothing in the facts suggests that *Plaintiffs* cannot. *Id.* at 33 ("It is not enough that a given activity is done for the employer's benefit.").

What *Integrity Staffing* suggests, in other words, is a distinction between an employee's principal activities, the rules the employee must follow at work, and processes the employer puts in place to enforce compliance with the rules — particularly at ingress and egress.[12] An employee might have to follow a rule at work, and the compliance measures might be required by the employer, *see Integrity Staffing*, 574 U.S. at 36, but it does not follow that the measures are indispensable to the employee's principal activities. Once again, compliance measures are "two steps removed" from the work. *IBP*, 546 U.S. at 42.

The foregoing interpretation of *Integrity Staffing* tallies with the Supreme Court's reliance on a Department of Labor ("DOL") opinion letter concluding that a pre-shift search at a rocket-powder plant for "matches, spark producing devices such as cigarette lighters, and other items which have a direct bearing on the safety of the employees" was not compensable. *See Integrity Staffing*, 574 U.S. at 35–36 (citing Dep't of Labor, Wage & Hour Div., Opinion Letter to Dep't of Army, Off. of Chief of Ordnance (Apr. 18, 1951), pp. 1–2). If a pre-shift search for prohibited fire-starters at an explosives factory is not integral or indispensable to those employees' principal activities, it is hard to imagine why a search for contraband at a prison would be: Both searches are directed at excluding items that would be dangerous in the workplace. That interpretation also tallies with the bulk of authority holding as a matter of law (either at the pleadings or at summary judgment) that pre-shift security screenings generally are not compensable.[13]

---

[12] *See Sanford v. Preferred Staffing Inc.*, 447 F. Supp. 3d 752, 756 (E.D. Wis. 2020) ("Plaintiffs contend that the preliminary processes required by the Staffing Defendants are indeed integral to the principal activities they were hired to perform. … Plaintiffs' view again conflates the requirements an employer imposes upon its employees with the actual work the employees are meant to perform."); *Dinkel v. MedStar Health Inc.*, 99 F. Supp. 3d 37, 40 (D.D.C. 2015) ("Plaintiffs argue that they have established that the Class members' uniform maintenance activities were part of their principal work duties because their job descriptions required compliance with Defendants' dress and appearance, patient safety and inflectional control policies. … However, a requirement to comply with these several policies is not enough to establish uniform maintenance as a principal work activity. An activity is only compensable as a principal activity if the employee is 'employed to perform' that activity.") (quotes and citation omitted) (quoting *Integrity Staffing*, 574 U.S. at 34).

[13] *Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 592–93 (2d. Cir. 2007) (pleadings); *Bonilla v. Baker Concrete Construction, Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007) (summary judgment); *Whalen*

Plaintiffs' principal contrary authority, *Aguilar v. Management & Training Corp.*, is against the weight of caselaw. 948 F.3d 1270 (10th Cir. 2020). It is also wrongly decided. In that case, the Tenth Circuit held that a pre-shift security screening for prison employees was part of the employees' principal activities because "the security screening and the officers' work share the same purpose" and because the screening was "tied to" the employees' work. *Id.* at 1278 (quoting *Integrity Staffing*, 574 U.S. at 36).

That test is incorrect. The question is not whether pre-shift activities align with the "purpose" of employment. If it were, then virtually every pre- and post-shift activity required by an employer would be compensable. Why would an employer mandate a given activity in the first place if not to further the "purpose" of employment? *Integrity Staffing* rejects that approach: "If the test could be satisfied merely by the fact that an employer required an activity, it would sweep into 'principal activities' the very activities that the Portal-to-Portal Act was designed to address." 574 U.S. at 36.[14]

Nor is it enough for an activity to be "tied to" the employee's work. *Aguilar*, 948 F.3d at 1278. The Tenth Circuit took that test from *Integrity Staffing*'s reference to activities "tied to the productive work that the employee is employed to perform." 574 U.S. at 36. But it appears to have read the *Integrity Staffing* Court's language in isolation, not in the context of a detailed explanation of what it *means* for pre- or post-shift activity to be part of the employee's principal activities. Far from merely directing lower courts to analyze in the abstract whether an activity is "tied to" an

---

*v. United States*, 93 Fed. Cl. 579, 600 (2010) (summary judgment); *Henderson v. Cuyahoga Cty.*, No. 1:20-CV-1351, 2020 WL 5706415, at *3 (N.D. Ohio Sept. 24, 2020) (pleadings); *Cinadr v. KBR, Inc.*, No. 3:11-CV-00010, 2013 WL 12097950, at *7 (S.D. Iowa Feb. 15, 2013) (summary judgment); *Ceja-Corona v. CVS Pharmacy, Inc.*, No. 1:12-CV-01868, 2013 WL 796649, at *9 (E.D. Cal. Mar. 4, 2013) (pleadings), *on reconsideration in part*, No. 1:12-CV-01868, 2013 WL 3282974 (E.D. Cal. July 2, 2013); *Jones v. Best Buy Co.*, No. CV-12-95, 2012 WL 13054831, at *2–3 (D. Minn. Apr. 12, 2012) (pleadings); *Phillips v. Washington Grp. Int'l, Inc.*, No. 1:09-CV-00431, 2010 WL 11561237, at *5 (N.D. Ala. Sept. 29, 2010) (summary judgment); *Anderson v. Perdue Farms, Inc.*, 604 F. Supp. 2d 1339, 1359 (M.D. Ala. 2009) (summary judgment); *Sleiman v. DHL Express*, No. CIV.A. 09-0414, 2009 WL 1152187, at *4–5 (E.D. Pa. Apr. 27, 2009) (pleadings); *but see Fritz v. Corizon Health, Inc.*, No. 6:19-CV-03365, 2020 WL 9215899, at *9 (W.D. Mo. Jan. 31, 2020) (declining to dismiss claims involving security screening for state prison nurses).

[14] That does not necessarily mean I must *ignore* the purpose of employment. Identifying an employee's "principal activities" and their relationship to other activities presumably entails understanding what ends his employment is supposed to serve — much like interpreting statutory terms might depend on knowing the statute's subject matter or the problem the statute is supposed to solve. *Cf.* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 20 (2012); Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967 (2021). The employer's purpose, however, is not an analytical substitute for the employee's actual work tasks any more than a statute's purpose displaces its text.

employee's principal activities, the Court requires analyzing whether the activity is integral and indispensable — a more focused inquiry, rooted in the words of the Portal-to-Portal Act. The Supreme Court's reasoning precludes the vague, atextual search for relatedness that the *Aguilar* court used. *See id.* at 33; *see also id.* at 38 (Sotomayor, J., concurring).

By asking the wrong questions, the *Aguilar* court reached the wrong answers. The Tenth Circuit held that the screenings were "'an intrinsic element of' the officers' security work" because "the security screening and the officers' work share the same goal," *Aguilar*, 948 F.3d at 1279 (quoting *Integrity Staffing*, 574 U.S. at 33) — a mistaken test that conflates the employer's purposes with the employee's principal activities. The court also concluded that the screenings were "indispensable" because "an officer cannot safely and effectively maintain custody and discipline of inmates and provide security while also bringing weapons or contraband into the prison," *id.* (quotes and alterations omitted) — which, as explained above, confuses the employer's requirements for the employee with the compliance measures the employer chooses to implement.

As a result, as a matter of law, any time Plaintiffs spend on pre-shift security screenings is not compensable because it is not "integral and indispensable" to their principal activities.

### *2. Donning the Duty Belt*

The second activity at issue is donning a security belt and other gear. It is undisputed that Plaintiffs need a belt with certain attachments, including metal clips and chits, before they can obtain other equipment. Pls.' Mem. App. A at 99–100, 104 (Whinnery Dep.); Def.'s App. at 58–59 (Whinnery Dep.); Pls.' App. B at 8–9 (Buckingham Decl. ¶¶ 23–24). Whether that time is compensable involves questions of fact that cannot be resolved at summary judgment.

When donning specialized equipment such as protective gear is necessary for a job, the time spent donning is integral and indispensable to the job and therefore compensable. *IBP*, 546 U.S. at 30. That rule, however, does not extend to generic equipment, even when the generic equipment is required. The Supreme Court has contrasted "the donning and doffing of specialized protective gear," which can be compensable time, *see IBP*, 546 U.S. at 30, with activities analogous to "changing clothes and showering under normal conditions," which is not, *see Steiner*, 350 U.S. at 249. Some courts have distinguished between "special protective gear," *Reich v. IBP, Inc.*, 38 F.3d 1123, 1126 (10th Cir. 1994), and "generic protective gear," like "a helmet, safety glasses and steel-toed boots," *Gorman*, 488 F.3d at 594; *see Reich*, 38

F.3d at 1125; *see also Integrity Staffing*, 574 U.S. at 36 (an activity is not integral and indispensable "merely [because] an employer required [the] activity").

Some of the parties' disputes seem to be immaterial. *Where* Plaintiffs don their belt — a major dispute in the briefing — might matter if the continuous workday rule applied. In that event, if donning were Plaintiffs' first principal activity, Plaintiffs could then argue that everything they do afterward until their last principal activity of the day is compensable. Pls.' Reply at 14–15.[15] But the continuous workday rule does not apply to federal employees covered by OPM regulations, *see Bridges*, 156 Fed. Cl. at 134, so noncompensable activities do not become compensable merely by virtue of taking place after a compensable activity.[16] The compensability of Plaintiffs' time has to be evaluated activity-by-activity. Because the continuous workday rule does not apply, it is immaterial where or when Plaintiffs don their belt.

What *does* matter, then, is the nature of the items Plaintiffs don — because only donning specialized equipment is compensable — and how long the donning takes. Although a duty belt — regardless of its exact characteristics — is likely a generic item rather than a specialized one, Def.'s App. at 658 (O'Kane Decl. ¶¶ 14, 16), the question is factual. Likewise, the parties disagree on the exact characteristics required of the belt. Pls.' Reply at 15–16; Def.'s Cross-Mot. at 29–30. The parties' factual disagreements prevent me from resolving the question as a matter of law. The same is true of the clips, chits, and chains Plaintiffs attach to their belts. Pls.' Mem. App. A at 98, 103 (Whinnery Dep.); Def.'s App. at 56–57 (Whinnery Dep.).

Nor does the record permit a clear conclusion about how much time donning takes. As mentioned, pre- and post-shift activities are only compensable if they require more than *de minimis* time, and the parties disagree about how long their pre- and post-shift activities take. Def.'s Cross-Mot. at 50–57; Pls.' Reply at 33–37. But even eliminating certain time from Plaintiffs' claims, it is Defendant's burden to show there is no question of fact that the remaining time is *de minimis*. *Dairyland Power*, 16 F.3d at 1202. Conflicts between Plaintiffs' declarations and Defendant's video analysis, and between different views of the accuracy of the video analysis, are not suitable for summary judgment. *See Jay v. Sec'y of Dep't of Health & Hum. Servs.*, 998 F.2d 979, 982 (Fed. Cir. 1993) (citing *Anderson*, 477 U.S. at 255). Defendant's argument that Plaintiffs' time is *de minimis* even if longer than 10 minutes — based on factors such as "practical administrative difficulty of recording additional time,

---

[15] Likewise, if the security screening had involved compensable time, donning the belt would also be compensable time under the continuous workday rule if it happened afterward.

[16] That obviates the question whether a *de minimis* activity can start a continuous workday. *See Singh v. City of New York*, 524 F.3d 361, 371 n.8 (2d Cir. 2008); *but see Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 817 (D. Md. 2014),

the aggregate amount of compensable time, and the regularity of the work," Def.'s Cross-Mot. at 49 (*quoting Carlsen*, 521 F.3d at 1380–81) — is even less amenable to resolution at this stage.

Finally — even if Plaintiffs show that donning the belt is integral and indispensable to their work and takes place immediately after security screening — some subsequent pre-shift activities are noncompensable, as discussed below. If the factual record ultimately shows that donning a belt takes a matter of moments, there would be a legal question about whether *de minimis* time spent in integral and indispensable activities can be aggregated with non-contiguous time spent on other integral and indispensable activities during the workday. The parties have not adequately briefed that question, so I express no view on it here.

### 3. Clearing the Sally Port

The next activity at issue is clearing the sally port. Checking in and waiting to check in are ordinarily noncompensable as preliminary and postliminary time. *Integrity Staffing*, 574 U.S. at 34 (citing DOL regulations); *id.* at 39 (Sotomayor, J., concurring) (reasoning that "checking in and out and waiting in line to do so" are "activities that Congress clearly deemed to be preliminary or postliminary"). Plaintiffs concede that clearing the sally port fits that description. *See* Tr. at 53; *see also Alkire*, 158 Fed. Cl. at 395–96. There is no genuine dispute of material fact on that question.

Plaintiffs argue instead that passing through the sally port is compensable as part of the continuous workday. Tr. at 53. But the continuous workday rule does not apply. *Bridges*, 156 Fed. Cl. at 134. Time spent passing through the sally port is therefore non-compensable as a matter of law.

### 4. Proceeding to and from the Duty Post

The next segment of Plaintiffs' claims involves the time they spend walking from the sally port to duty stations (other than the Control Center), and then back to the sally port at the end of the day. Factual disputes about that time — in addition to the parties' dispute about whether pre- and post-shift activities involve more than *de minimis* time — preclude summary judgment for either party.

Simply walking from a check-in location to a workstation is expressly excluded from compensation under the Portal-to-Portal Act. 29 U.S.C. § 254(a)(1); *IBP*, 546 U.S. at 40–41. Some cases have held that no compensation is required for time when off-duty employees need to be on call or generally vigilant. *See, e.g.*, *Akpeneye v. United States*, 990 F.3d 1373, 1383–85 (Fed. Cir. 2021). The Eleventh Circuit, moreover, has held that time police officers spend commuting in marked police

vehicles is noncompensable even if they have to respond to "accidents, disabled vehicles, flagrant safety violations, or even routine traffic violations" on the way. *Llorca v. Sheriff, Collier Cty., Fla.*, 893 F.3d 1319, 1327 (11th Cir. 2018). But time on "standby status" is sometimes compensable work, *see, e.g.*, *Akpeneye*, 990 F.3d at 1383 (citing *Armour & Co. v. Wantock*, 323 U.S. 126 (1944), and *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)), and of course compensable work can involve walking from place to place.

Plaintiffs have provided evidence that when they walk from the sally port to their duty stations, they must maintain "constant vigilance," Pls.' Mem. App. A at 113–14 (Whinnery Dep.), and that they must correct behavior and otherwise interact with inmates, *id.* at 92–96, 126; Pls.' App. B at 12 (Buckingham Decl. ¶¶ 32–34). If that is true, Plaintiffs may be performing their principal duties while walking. But Defendant disputes Plaintiffs' characterization of their walk in several respects, including whether Plaintiffs' vigilance constitutes work and whether inmate interactions actually occur. Def.'s Cross-Mot. at 38–40 (citing, *inter alia*, *Akpeneye v. United States*, 138 Fed. Cl. 512, 521–29 (2018), *aff'd*, 990 F.3d 1373); Def.'s App. at 508–14 (Compound #1 Post Orders); *id.* at 48, 102–03 (Whinnery Dep.); Tr. at 108–12.

The parties' disagreement is genuine because they present contradictory evidence. And the dispute is material because it goes to whether Plaintiffs perform their principal activity of maintaining Prison security — *i.e.*, whether they are engaging in compensable activities or merely covering distance. The dispute also bears on how to characterize Plaintiffs' need to maintain vigilance while walking, which may or may not be compensable depending on the specifics. Such fact-dependent questions are unsuitable for resolution as a matter of law where the evidence conflicts. *See Cheung v. United States*, 157 Fed. Cl. 508, 532 (2021) (citing *Skidmore*, 323 U.S. at 133) (explaining that disputes over "whether an employee is in on-call or on standby duty status are questions of fact").

Relatedly, the parties dispute the facts of Plaintiffs' stop at the Lieutenant's office, in particular the necessity of the stop for receiving pre-shift information. Pls.' App. B at 11 (Buckingham Decl. ¶ 31); Pls.' Mem. App. A at 8–9 (Dumont Dep.); Def.'s App. at 7–9 (Dumont Dep.).[17] Time in pre-shift briefings is sometimes compensable,

---

[17] Defendant argues that Plaintiffs failed to plead claims related to time visiting the Lieutenant's office. Def.'s Cross-Mot. at 43–44. Although the Complaint does not mention the office visits, Plaintiffs have not introduced new claims or claims about a new time period. *See Coleman v. Bowden*, 797 F. App'x 422, 430 (11th Cir. 2019) (plaintiffs "cannot raise a new, unpled *claim* at the summary judgment stage") (emphasis added); *Albrecht v. Wackenhut Corp.*, 379 F. App'x 65, 68 (2d Cir. 2010) (plaintiffs cannot be compensated when "the operative complaint did not allege … failure to compensate for [a specific] time *period*") (emphasis added). Plaintiffs merely described an additional specific activity

depending on the facts. *Serna v. Bd. of Cty. Comm'rs of Rio Arriba Cty.*, No. CV 1:17-00196, 2018 WL 3849878, at *5 (D.N.M. Aug. 13, 2018) (holding that pre-shift security briefings for correctional officers were integral and indispensable); *Jimenez v. Bd. of Cty. Comm'rs of Hidalgo Cty.*, 697 F. App'x 597, 598–99 (10th Cir. 2017) (reversing the district court's summary judgment determination that the time spent on a pre-shift briefing for a 911 dispatcher was not integral and indispensable). But because I cannot resolve factual questions about the substance and necessity of Plaintiffs' visits to the Lieutenant's office, summary judgment is inappropriate as to that dispute as well.

### 5. *Equipment and Information Exchanges*

The parties do not appear to disagree that the exchange of equipment between outgoing and incoming officers is integral and indispensable to Plaintiffs' duties. Pls.' Mem. at 29; Def.'s Cross-Mot at 48, 51. But as above, the parties dispute whether Plaintiffs' pre- and post-shift time is more than *de mimimis*. There appear to be several other genuine disputes of material fact as well.

For one thing, the parties disagree about whether officers on 16-hour shifts are compensated when they begin the exchange at the Control Center. Def.'s App. at 508, 573, 575, 584, 597 (post orders); Pls.' App. B at 14–15 (Buckingham Decl. ¶ 40); Pls.' App. B at 29 (Conklin Decl. ¶ 38); *see* Tr. at 63–65, 105–07, 131–32. The parties also disagree about whether the information exchange at the duty post is necessary or even productive for the incoming officer's duties. *E.g.*, Pls.' App. B at 13 (Buckingham Decl. ¶ 36); Def.'s App. at 70, 80–81 (Whinnery Dep.); *id.* at 12–13 (Dumont Dep.). I cannot resolve those genuine disputes at summary judgment, and they preclude judgment as a matter of law.

## C. Liquidated Damages and Three-Year Statute of Limitations

Plaintiffs argue that they are entitled to liquidated damages and a three-year statute of limitations. Pls.' Mem. at 36–40. Defendant cross-moves on the same issues. Def.'s Cross-Mot. at 62. Summary judgment is inappropriate for either side.

A FLSA plaintiff is presumptively entitled to liquidated damages when a defendant violates FLSA. 29 U.S.C. § 216 (a defendant "shall be liable to the employee or employees affected in the amount of … their unpaid overtime compensation … and in an additional equal amount as liquidated damages"). A court can decline to award

---

during allegedly uncompensated time. Plaintiffs are not required to list every allegedly compensable activity in which they were engaged in order to state a valid claim for overtime under FLSA. *Adegbite v. United States*, 156 Fed. Cl. 495, 504 (2021) ("While each Plaintiff will need to prove the specific overtime hours they worked without compensation to win their case, they do not need to plead each of those hours in their Complaint.").

liquidated damages (or reduce the amount) if the defendant "shows to the satisfaction of the court that the act or omission giving rise to [the FLSA] action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of [FLSA]." 29 U.S.C. § 260; *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 n.22 (1985); *Shea v. United States*, 976 F.3d 1292, 1299 (Fed. Cir. 2020). To obtain the benefit of a three-year statute of limitations, Plaintiffs must demonstrate that Defendant willfully violated FLSA. 29 U.S.C. § 255(a). An employer has acted willfully when he "either knew or showed reckless disregard for the matter of whether [his] conduct was prohibited by [FLSA]." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

Until Plaintiff establishes that Defendant is actually *liable* for a FLSA violation, there is no basis to resolve questions about Defendant's state of mind. *See Moreno v. United States*, 82 Fed. Cl. 387, 395, 398 (2008). The parties may develop the relevant evidence on the merits as necessary.

## CONCLUSION

In summary, Plaintiffs' Motion for Partial Summary Judgment is **DENIED**. Defendant's Motion for Partial Summary Judgment is **GRANTED** as to Plaintiffs' claims related to (1) the security screening, and (2) clearing the sally port. It is **DENIED** in all other respects.

The parties are **ORDERED** to submit a joint status report proposing further proceedings no later than **September 26, 2022**.

Pursuant to the Court's October 31, 2019 Protective Order (ECF 15), this Opinion has been issued under seal. The transcript of oral argument is under seal as well. The parties shall have two weeks to propose redactions and, accordingly, shall file notice of their proposed redactions no later than **September 8, 2022**. To aid the Court's evaluation of the proposed redactions and in light of the "presumption of public access to judicial records," *Baystate Techs., Inc. v. Bowers*, 283 F. App'x 808, 810 (Fed. Cir. 2008) (per curiam), each party shall file a memorandum explaining why redactions are necessary for each item of information for which a redaction is proposed.

**IT IS SO ORDERED**.

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge